FILED

2007 Jun-12  PM 03:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **TERRI BLUME,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **2:05-cv-1896-UWC** |
| **SHELBY CONCRETE, LLC;** | ) | |
| **SHELBY CONCRETE, INC.; and** | ) | |
| **BOBBY KNOX,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The present action was initiated by Terri Blume ("Blume") against Defendant

Shelby Concrete, which is owned equally by Defendant Bobby Knox ("Knox") and his

brother.[1]  Blume asserts claims of sexual harassment and retaliation, pursuant to Title VII.

42 U.S.C. Section 2000e, along with Alabama state law claims for invasion of privacy,

outrage, intentional interference with contractual relations, as well as a claim for negligent

supervision, training and retention.

Presently before the Court is a motion for summary judgment by Shelby Concrete,

---

[1]  The Court will refer to Defendants collectively as "Shelby Concrete," unless otherwise
necessary for the sake of clarity.

as well as a motion to strike: 1) the affidavit of Millard Martin; 2) the affidavit of Bonnie

Knox Cahalane; and 3) the EEOC charge of Lisa Partridge.

For the reasons explained below, the Court finds that the summary judgment

motion is due to be granted in part and denied in part.  Specifically, summary judgment is

due to be denied on the following claims: sexual harassment, retaliation, invasion of

privacy, outrage, and negligent supervision, training and retention.  However, Shelby

Concrete is entitled to summary judgment on Blume's intentional interference with

contractual relations claim.  Shelby Concrete's motion to strike is moot.


## I.  FACTS

**A.      Background Facts Regarding Blume's Employment Duties:**

Blume was employed by Shelby Concrete as a payroll clerk.  She was placed at the

company by VIP, an employment agency, as a temporary employee on December 15,

2003.  (Def.'s Ex. A, Blume Dep. 26, 29, 31.)  By mid-May of 2004, she became a full-

time permanent employee.  (Blume Dep. 25.)

Blume was not given anything in writing that described her job duties when she

began working at Shelby Concrete.  (Defs.' Ex. B, Hobart Dep. 27.)  According to Blume,

her responsibilities included entering hours from time cards into the computer system and

preparing payroll for all of the 21 or 22 plants.  (Blume Dep. 69, 71.)  The payroll process

involved a great deal of paperwork, which took Blume almost a week to prepare.  (Blume

Dep. 95.)

Blume's duties also included paying payroll taxes.  (Blume Dep. 71- 72.)  This duty involved obtaining figures that had been calculated by controller Thomas Hobart and telephonically authorizing the appropriate deductions from the account of Shelby Concrete.  (Blume Dep. 73-76; Hobart Dep. 33.)  This task took no more than thirty to sixty minutes per week.  (Blume Dep. 75-76.)  The federal tax payments are due weekly and employers have three days after the pay period ending date to make the payment.  (Hobart Dep. 30-31.)  Other tax payments are due at various intervals.

While Shelby Concrete contends in its brief that Blume was solely responsible for making the tax deposits, throughout her deposition Blume insisted that both she and another employee, Brenda Barnes ("Barnes") shared the responsibility.  (Blume Dep. 72, 74, 78, 80, 83-84, 91, 95, 118, 122-23.)  According to Blume, Barnes originally performed this duty solely, but later trained Blume on the procedure.  (*Id*. at 72.)  When one of these two women was unable to handle the payroll taxes, the other woman handled the payment; whichever one had the time to perform the task.  (*Id*. at pp. 74, 81.)  [2]

At some point during her employment, Blume remembers Hobart typing a list of job duties and giving it to her.  (Blume Dep. 541-44; Blume Dep. at Ex. 15.)  In contrast, Hobart recalls that in mid-February 2004 he asked Blume and Barnes to each type a list of

---

[2]  On a motion for summary judgment, this Court must view the facts in the light most favorable to this non-movant Plaintiff.  *Storck v. City of Coral Springs*, 354 F.3d 1307, 1309 (11th Cir. 2003).

their duties.  (Hobart Dep. 27-29.)  In any event, the list of duties for Blume that Shelby Concrete produced during discovery contains the phrase "[p]ay all governmental agencies for all taxes due in a timely manner."  (Blume Dep. at Ex. 16.)  However, Blume does not recall seeing this job duty on the document Hobart gave her during her employment. (Blume Dep. 541-546.)

**B.  Incidents Involving Blume's Conduct During Working Hours:**

In its brief, Shelby Concrete mentions two incidents involving Blume's conduct. While Shelby Concrete describes each incident in an unflattering manner, Blume's testimony indicates that both incidents were fairly innocuous**.**  The first incident involves Blume's work attire.  Blume testified that she generally wore jeans, a t-shirt and tennis shoes to work.  (Blume Dep. 149.)  She never had her panties showing above the waist-line of her pants and she never wore mid-driffs.  (*Id*. at pp. 149-153.)  According to Blume, at one point another employee told Blume that Barnes had complained about two shirts Blume had worn.  The employee did not explain the nature of the problem, but warned that Barnes and Knox were close.  According to Blume, Barnes never spoke to Blume directly about this issue and Blume testified that she was perplexed because other employees frequently wore mini-skirts to work.  This was the only time anyone mentioned her clothing; she was never sent home because of her attire, nor did she change the style of clothing she wore to work after the conversation about her shirts.

The next incident involved a photograph Blume brought to work of herself on the beach in a bikini.  Apparently, Blume frequently sold items at a local flea market.  When a co-worker asked if Blume if she sold bathing suits and how they looked, Blume indicated she sold them but had none in stock.  Later, she brought the photograph to work in an effort to show the female co-worker how the bathing suits looked.  Although Shelby Concrete implies that the photograph was suggestive, Blume testified that the photograph was a frontal shot where she was sitting with her knees together and her knees were buckled underneath her body.  More importantly, Blume only showed the photograph to one or two female employees.  (Blume Dep. 155-60, 163-64.)

## C.  Incidents of Sexual Harassment:

Blume complains of numerous incidents of sexual harassment.  She testified that Knox was "always" fondling his crotch in his office.  (Blume Dep. 212.)  On several occasions, he called Blume into his office for no particular reason and he would be "sprawled out on the sofa . . .  rubbing his crotch."  (Blume Dep. 205.)  He said it had been a long time since he had sex and he was going to explode.  (Blume Dep. 205, 227.)  He also told Blume that he was divorced and maybe he and Blume could help each other out since she was not married.  (Blume Dep. 205.)

On his birthday, Knox asked Blume, who had worn a dress, whether she got dressed up for him and asked if she could give him a birthday present after work.  (Blume Dep.

205.)

On Blume's birthday she received a birthday card signed by several persons, that included a condom immediately affixed above the signature "Bobby Knox."  (Blume Dep. at Ex. 5.)  Knox admits that if Blume received such a card, it would be considered sexually harassing.  (Knox Dep. 87.)

At one point during her employment, Knox told her that he had not gotten "any" and he was going to make her sign something so she would not sue him for sexual harassment.  (Blume Dep. 225, 338.)  On several occasions he asked Blume if she had gotten any the night before.  (Blume Dep. 583-84.)

On one occasion Knox asked Blume if she had ever worked as a dancer.  (Blume Dep. 252-53.)  Later, he told her she could make money working elsewhere; Blume testified that Knox was referring to exotic dancing.  (Blume Dep. 252.)

On several occasions, Blume observed questionable behavior involving Knox and Brenda Barnes.  The first incident occurred when Blume walked in on Knox while Barnes was apparently performing oral sex on him.  (Blume Dep. 208-09.)  Knox had his back to Blume and Barnes had her head in Knox's lap and his pants were undone.  (Blume Dep. 213.)  Barnes claimed she was not performing oral sex, but was instead fixing Knox's computer.  (Blume Dep. 290, 213.)

On another occasion Blume entered Knox's office and discovered him sitting on his couch wearing socks, a golf shirt, his underwear and a sheet draped over his legs.  (Blume

Dep. 226-37.)  On that same day, Barnes was wearing the pants Knox had worn earlier that same day.  (Blume Dep. 335-35, 215-216.)  Knox testified that he often kept several pairs of pants in his office and that Barnes had spilled a drink on her pants, after which Knox gave her a pair of pants so she would not have to travel home, some forty miles away to change.  (Knox Dep. 71.)

Despite the denials about a relationship between Knox and Barnes, Knox admits that he has engaged in sexual relations with his some of employees.  Specifically, he admits having sexual relations with Cindy McRee during her employment.  (Knox Dep. 39, 54.)  Additionally, he admits having sexual relations with his third wife, Bonnie Knox Cahalane, prior to their marriage and during her employment with Shelby Concrete. (Knox Dep. 22-24.)

In addition to these comments and incidents, Blume alleges Knox made unwanted physical contact with her.  Shelby Concrete disingenuously describes these incidents as Knox "brushing up" against Blume.  However, frequently when Blume was in the kitchen and/or in Knox's office, Knox would avoid walking around her and instead he would "slide his front side up against [her] backside."  (Blume Dep. 207.)  "And it wasn't a quick oops, sorry, I bumped into you, it was a slow slide across."  (Blume Dep. 207.)  This occurred approximately twenty times.  (Blume Dep. 207-208.)  When asked if he ever pressed his crotch against her, Knox said "yes."  (Knox Dep. 134.)

At some point during late April or early May, while Knox was in the process of

getting a divorce from his third wife, he invited Blume and two other female employees to visit him in a hotel room, where he lived.  (Blume Dep. 210-22, 594.)  Blume responded that this would not be a good idea.  (*Id*. at p. 318.)  In response, Knox commented that if Blume did not come to the hotel room he would pull his rank or pull his card; Blume interpreted this comment as a threat that Knox would fire her if she did not acquiesce.  (*Id*. at pp. 313-14, 593.)  According to Blume, one of the other employees, commented that she had three children and could not afford to lose her job.  (Blume Dep. 593-94.)

Sometime in late June, Knox asked Blume why she did not come to his room the last time he invited her and asked her again to visit him in his hotel room.  (Blume Dep. 596, 598.)  He also told her that if she did not come to the hotel he could pull his "employment players card."  (Blume Dep. 598.)  Blume did not accept Knox's invitation and approximately three weeks later she was fired.  (Blume Dep. 587.)

**D. Complaints to Management**:

Blume testified that she complained to Shelby Concrete management about Knox's conduct on numerous occasions.  The first time was in February or March of 2004, when she told Doris Knuppel, an accounts manager, about the comment Knox made about sex and being ready to explode and about him rubbing his crotch.  (Blume Dep. 366-68.)  Blume testified that she was very upset and she was crying.  According to Knox, Knuppel indicated Knox had been through a lot of women at the company and what Knox did and

said goes because he ran the show.  (Blume Dep. 367-68.)

The next time she complained, in April, to controller Tom Hobart.  She complained about having to run personal errands for Knox, even when she was not on the clock.  She also complained about Knox rubbing his crotch, as well as Knox sliding his crotch against her buttocks.  She also complained about comments made by Knox.  According to Blume, Hobart acted as if such activity was the norm at the company, explaining that Knox was just like that.  (Blume Dep. 370-72.)

One or two weeks later, Blume had gone to the dispatch area and discovered pornography on the computer of an employee named Charles.  (Blume Dep. 374-76.)  Charles was viewing the site and talking with someone on the telephone who was saying "yeah, I'm seeing it, I'm seeing it."  (*Id*. at p. 375.)  Shortly thereafter, Blume entered Knox's office.  He was viewing the same pornographic site and talking on the telephone.  When she entered, he hung up and commented that Charles was crazy.  (*Id*. at pp. at 374-78, 381-84.)  When Blume complained to Hobart, he indicated that Charles and Knox were buddies and so nothing could be done about the matter.  Indeed, the employees used the term FOB or "Friend of Bobby" to describe those in Knox's inner circle.  (Blume Dep. 379-80.)

Around late April or early May, Blume complained to Millard Martin, Shelby Concrete's former credit manager, about being sent to run personal errands for Knox, about Knox rubbing his crotch and about Knox sliding his crotch up against her buttocks.

(Blume Dep. 385-87.)  Although Martin does not remember all the details, he admits that

Blume complained about harassment on several occasions and that she was clear the

harassment was sexual in nature.  (Pl.'s Ex. 2, Martin Aff. ¶¶ 9, 11, 13.)  Blume testified

that, during the conversation with Martin, he called Hobart into the room.  (Blume Dep.

385-86.)  In his affidavit, Martin does not mention calling Hobart into the room, but

Martin does remember opting not to report the complaints because he was of the opinion

that nothing would be done to stop the conduct, particularly since Knox and his brother

owned the company.  (*Id.* ¶ ¶14, 17.) [3]

      Martin told Blume that if she preferred he would call the temporary agency to see

about getting her another job and he would give her a reference.  (Blume Dep. at 397-98.)

After this conversation, Blume registered on Monster.com and looked at employment

advertisements in the newspaper.  (Blume Dep. 389-90.)

      Later that same week, Blume complained again to Doris Knuppel.  This time,

Blume described the internet pornography, the errands, and Knox's requests to come to his

hotel room.  According to Blume, Knuppel said she believed Knox was blowing smoke

with regard to the comment about Blume possibly losing her job.   Knuppel also indicated

---

      [3]  Shelby Concrete asks this Court to strike portions of the Martin affidavit that are
not based upon personal knowledge.  Inasmuch as the Court has only relied on portions of
the Martin affidavit that purport to contain first-hand knowledge, the Court finds that the
motion is moot.  The motion is also moot with respect to the affidavit of Bonnie Cahalane
and the EEOC charge of Lisa Partridge because such information was not considered by
this Court.

she was not surprised about the internet pornography and she explained that most of

Knox's wives had come from his employee pool.  (Blume Dep. 389, 397-99.)

 Blume testified that each time she complained she indicated that the harassment

was sexual in nature.  (Blume Dep. 391-02.)

  During Blume's unemployment compensation hearing, she did not mention the

sexual harassment.  When asked why not, Blume testified that she did not mention the

sexual harassment because "they only asked her about worked related issues."  (Blume

Dep. 453.)  Blume does note that she complained to her placement agency, VIP, about the

alleged harassment and asked for a different job assignment.  (Blume Dep. 112-14.)


**E.  Incidents Occurring Immediately Prior to Blume's Termination**:

 Near the end of July 2004, Blume was treated in the emergency room and on July

21, 2004, she was admitted to the hospital for an ovarian cyst .  (Blume Dep. 131-35.)

This was the last day she worked at Shelby Concrete.

 Hobart assigned another employee, Pat Strickland, to handle Blume's payroll

functions.  According to Hobart, Strickland discovered that the payroll taxes had not been

made and that some garnishments had not been processed.  Additionally, Strickland

purportedly discovered unopened mail, as well as some documents that had not been

placed in employee personnel files.  (Hobart Dep. 53.)  Finally, according to Hobart, even

though Blume worked through July 21, the payroll taxes had not been made for pay

periods ending May 21, May 28, June 4, June 11, and June 18.  (Hobart Dep. 54-55.)

Ultimately, Shelby Concrete was assessed $20,000 in penalties because the payroll taxes

were late.

Hobart discovered the problem with the payroll taxes around July 27 and sent a

termination letter to Blume on June 30.  (Hobart Dep. 53-55; Blume Dep. at Ex. 4.)   The

letter explained that Blume was being terminated because

> [w]e found that federal deposits were not made, confidential payroll
> information not filed, mail not opened, employee payroll changes not filed,
> garnishments and child support information not filed, weekly payrolls found
> in drawers and files.

(Blume Dep. at Ex. 4.)  Prior to her illness, Blume had not received any counseling or

disciplinary action.  Additionally, there had been no discussions about poor job

performance.  (Hobart Dep. 50-51, 55-56, 75.)

## ANALYSIS

A.    **Sexual Harassment**:

Shelby Concrete argues that it is entitled to summary judgment because the

incidents about which Blume complains were not "of a sexual nature."  This argument is

disingenuous.  Knox's comments such as he had not had sex and was about to explode

were clearly sexual in nature.  (*See* Blume Dep. 205, 227.)  Additionally, commenting that

he wanted Blume to sign a document saying she would not sue him for sexual harassment,

viewing internet pornography, and placing a condom in her birthday card were

unquestionably sexual in nature.  Finally, Knox's conduct, including sliding his crotch

along Blume's backside, was sexual in nature.

Next, Shelby Concrete argues that it is entitled to summary judgment because the

alleged conduct was not severe or pervasive.  To determine whether the challenged

conduct is severe or pervasive, Courts must look at the totality of the circumstances and

consider four factors:  (1) the frequency of the challenged conduct; (2) its severity; (3)

whether it is physically threatening or humiliating; and (4) whether the conduct

unreasonably interfered with the employee's job performance.  *See Harris v. Forklift Sys.*

*Inc.*, 510 U.S. 17, 23 (1993).

Shelby Concrete supports its severe and pervasive argument by citing several cases

where federal Courts of Appeal found that the alleged conduct was not sufficiently severe

or pervasive. [4]  These cases are unpersuasive because they were not handed down by the

_____

[4] *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993)
(no severe or pervasive harassment where a supervisor repeatedly asked the plaintiff
about her personal life, told her how beautiful she was, asked her on dates, called her a
dumb blonde, put his hand on her shoulder six times, placed "I love you" signs in her
work area, and tried to kiss her several times);  *Adusumilli v. City of Chicago*, 164 F.3d
353, 361 (7th Cir. 1998) (no severe or pervasive harassment where co-employees teased
plaintiff about eating a banana, questioned whether she wore a low neck top the night
before, repeatedly stared at her breasts with attempts to make eye contact, and four
isolated incidents occurred where a co-worker briefly touched her arm, fingers, and
buttocks);  *Black v Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997) (no severe or
pervasive harassment where conduct over a four-month period involved looking plaintiff
up and down while commenting "nothing I like more in the morning than sticky buns,"
suggesting land development project located near Hooter's Restaurant be called
"Titsville" or "Twin Peaks," and inquiring whether Plaintiff had danced on the tables at a
biker bar the previous night);  *Shepherd v. Comptroller of Public Accounts of Texas*, 168

Eleventh Circuit.  Additionally, these cases are not similar to the present case which involves approximately twenty incidents where Knox rubbed his crotch against the Plaintiff's buttocks, along with other similar conduct.

Shelby Concrete also supports its severe and pervasive argument by citing two Eleventh Circuit Court of Appeals cases where the Court found that the alleged harassment was not sufficiently severe or pervasive to constitute actionable conduct: *Mendoza v. Borden, Incorporated*, 195 F.3d 1238, 1246 (11th Cir. 1999) and *Gupta v. Florida Board Of Regents*, 212 F.3d 571 (11th Cir. 2000).

The Court is not persuaded by Shelby Concrete's reliance on these two cases because the conduct in both cases was no where near as persistent or severe as the conducted alleged in the present case.  Rather, as the Eleventh Circuit pointed out, *Mendoza* merely involved "one slight touching [of Plaintiff's hip] as [she] walked by the fax machine," staring, and sniffs.  *Mendoza*, 195 F.3d at 1249.  Such conduct, held the Eleventh Circuit, "falls far short of actionable hostile environment."  *Id*.

 Similarly, the conduct alleged in *Gupta* was far less severe than the conduct

---

F.3d 871, 874 - 75 (5th Cir. 1999) (no severe or pervasive harassment where several incidents over a two-year period included comment that "your elbows are the same color as your nipples," telling plaintiff she had big thighs, touching plaintiff's arm on several occasions, and attempting to look down plaintiff's dress); *Quinn v Green Tree Credit Corp.*, 159 F. 3d. 759, 768 (2d Cir. 1998) (no severe or pervasive harassment where a supervisor commented that plaintiff had the "sleekest ass" in the office and was "deliberately touching plaintiff's breasts with some papers he was holding in his hand").

alleged by Blume.  In *Gupta*, the Plaintiff alleged that the harasser suggested she go to lunch at Hooters with he and other faculty members, he warned her to steer clear of faculty members, and organized several group outings to dinner at bars, stared at her twice, touched her ring and bracelet once, kept asking her to lunch, put his hand on her knee once and touched the hem of her dress.  *Gupta*, 212 F.3d at 585.  Unlike the incidents in the present case, the events in *Gupta* had no overtly sexual connotation.  Also, as the Eleventh Circuit pointed out in *Gupta*, "each [touching] incident [was] only momentary and neither was coupled with any verbal suggestions or advances."  *Id*. at 585.  These facts are in stark contrast to the numerous overtly sexual remarks and numerous touches in the present case.  Accordingly, Blume's sexual harassment hostile work environment claim may go forward.[5]

**B.    Retaliation**:

Shelby Concrete argues that Blume's retaliation claim fails because she cannot

---

[5]  The Court notes that Blume has also presented sufficient evidence to go forward with a claim for hostile work environment with adverse employment action, formerly described as a *quid pro quo* claim.  (*See* Compl. ¶ 11.)  Knox's comments about playing his employment players card, Blume's second refusal to acquiesce to the hotel visit demands and her termination shortly thereafter provide Blume with sufficient evidence to establish a *quid pro quo* claim.  The distinction between a *quid quo pro* claim and a traditional hostile work environment claim is significant because the employer's defenses against the two claims differ.

establish a causal connection between her complaints about the harassment and her termination.  Even if she could do so, argues Shelby Concrete, Blume cannot establish that the company's reasons for terminating her were pre-textual.

Shelby Concrete supports its causal connection argument by noting that Plaintiff first complained in Feb 2004 and she was discharged in late July 2004; thus, there was a five month period between the first instance of protected activity and her discharge. Shelby Concrete points out that the "[t]he cases that accept <u>mere temporal proximity</u> between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (emphasis added) (citation omitted).

Plaintiff counters by arguing that her last instance of protected activity occurred in late April or early May.  (Blume Dep. 386.)  Thus, the last instance of protected activity occurred no more than three months prior to her termination.  Plaintiff also points out that she was fired approximately three weeks after turning down Knox's second request that she come see him in his hotel room.  (Blume Dep. 587.)

The Court finds that Blume has established a causal connection based upon the roughly two to three month period between the last incidence of protected activity and her termination, as well as her termination just three weeks after she rejected Knox's second request that she visit him at his hotel room.  Unlike the cases relying on "mere temporal

proximity," to establish a causal connection, Plaintiff here has proffered evidence that she was terminated just three short weeks after she rejected Knox's second invitation to visit him in his room.  Moreover, Knox's request was accompanied by comments indicating he might fire her if she refused his request.  Given the evidence that Blume was indeed fired within a short time period thereafter, Blume's retaliation claim may go forward.

Next, the Court finds Shelby Concrete's pretext argument unpersuasive.  While Shelby Concrete indicates it terminated Blume because she failed to pay the company's payroll taxes, along with some other duties, there is evidence from which a jury might determine that Shelby Concrete's reasons are pre-textual.

First, a genuine issue of material fact exists regarding whether Blume was solely responsible for paying the payroll taxes.  Blume testified that she shared this duty with Brenda Barnes.  Blume also testified that she does not recall the list of duties exchanged between herself and Hobart including any indication that she was solely responsible for the payroll taxes.  Moreover, the Court notes that the list of duties Blume and Hobart exchanged does not contain Blume's signature.  (Def.'s Ex. A, Blume Dep. at Ex. 15.)  Yet, the record shows Blume's signature on the other documents in her personnel file, including acknowledgment that she received the company's anti-harassment policy and other company policies.  (Def.'s Ex. A, Blume Dep. at Exs. 1-2.)

If the jury believes that Blume and Brenda Barnes shared the payroll duties, evidence of pretext exists because Blume was terminated, while Barnes was not.

Inasmuch as Barnes, a co-employee who is alleged to have been sexually involved with Knox, was treated more favorably than Blume, who rejected Knox's advances, there is sufficient evidence that Shelby Concrete's proffered reasons for terminating Blume may have been pre-textual.  Thus, summary judgment on the retaliation claim is due to be denied.

## C.    Invasion of privacy:

In the present case, Blume attempts to establish invasion of privacy by showing that Knox intruded "upon [Blume's] physical solitude or seclusion."  *See Busby v. Truswal Systems Corp.*, 551 So. 2d 322, 323 (Ala. 1989) (citation omitted).  Specifically, Blume must present evidence that Knox's "wrongful intrusion into [Blume's] private activities [occurred] in such manner as to outrage <u>or</u> cause mental suffering, shame <u>or</u> humiliation to a person of ordinary sensibilities."  *Id*. at 323 (emphasis added) (citations omitted).

"While asking a co-employee for a date and making sexual propositions usually do not constitute an invasion of privacy, extensive inquiries into one's sex life or looking up one's skirt may constitute an invasion of privacy." *Kelley v. Worley*, 29 F. Supp.2d 1304, 1304, 1311 (M.D. Ala. 1998) (citing *Ex parte Atmore Comty Hosp.*, 719 So. 2d 1190, 1194 (Ala. 1998); *McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649, 651 (Ala.1986);  *Phillips v. Smalley Maint. Servs.*, 435 So. 2d 705, 709 (Ala.1983); Restatement (Second) of Torts § 652B cmt. c, ex. 7)).  That is,*"*[o]ne may invade another's privacy through either an

intrusion upon a physical space or by an invasion of one's "emotional sanctum"; the law prohibits a wrongful intrusion into either of these areas of privacy." *Kelley*, 20 F. Supp.2d at 1311 (citing *Phillips,* 435 So. 2d at 711).

The Court finds that Blume has presented a jury question with regard to her invasion of privacy claim because she has evidence that Knox invaded both Blume's physical space and her "emotional sanctum." *See Kelley*, 20 F. Supp.2d at 1311 (citing *Phillips,* 435 So. 2d at 711).  Not only did Knox ask Blume questions about her sex life, but he inquired about whether she had been a dancer.  In addition to these inquiries, he repeatedly held his crotch, repeatedly slid his crotch against her buttocks, and twice asked Blume to visit him at the hotel room where he lived.  A jury might easily find that such intrusions occurred "in such manner as to . . . cause . . .  humiliation to a person of ordinary sensibilities." *See Busby*, 551 So. 2d at 323.


**D.    Outrage**

To establish a claim for outrage under Alabama law, Blume must first establish that Knox's conduct was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Busby v. Truswal Systems Corp.*, 551 So. 2d 322, 324 (Ala. 1989).  In *Busby v. Truswal Systems Corporation*, the Alabama Supreme Court held that Plaintiffs presented a jury question on their outrage claim where the alleged harasser:

1) invited [two plaintiffs] to swim in his pool in the nude with him; (2) told
Busby that his hands were cold and asked if he could put them in her pockets
to keep them warm; (3) told the plaintiffs that he would "put a stick on their
machines" so they could masturbate while working; (4) said that he could
perform intercourse as fast as one of the machines at the plant could operate;
(5) said that he wished that the plaintiffs would come to work braless and
wear less clothing; (6) told one of the plaintiffs that if she had not stayed up
all night having sex she could do her work properly; (7) told one employee
that if she would give him 30 minutes with her that he would fill her pants in
nine months for her; (8) acted as if he was going to pinch one plaintiff's
breasts with a pair of pliers and with his hands; (9) said that he should send
one of the plaintiffs across the street to where a group of men were standing
because she stayed sexually aroused all of the time; (10) told one of the
plaintiffs that he was very tired and asked her if she would accompany him
to the restroom and hold his penis while he urinated; (11) told one of the
plaintiffs that her nipples were as large as another employee's entire breasts;
(12) attempted to follow one of the plaintiffs into the restroom and when she
asked him where he was going, said that he was going to help her; (13)
followed one of the plaintiffs one night; (14) said that a table in his office
had been damaged when one of the plaintiffs and a male co-employee had
sex on top of it; (15) openly stared at the plaintiffs' sexual anatomy; (16) put
his arm around the plaintiffs, grabbed their arms, and stroked their necks;
and (17) made other lewd remarks and gestures to the plaintiffs.

551 So. 2d at 324.

The present Court finds that the allegations in the instant action are similar in

severity to those alleged in *Busby*.  Here, Knox slid his crotch against Blume's buttocks on

approximately twenty occasions, made inquiries into her sex life, rubbed his crotch while

talking about sex, told Blume they might be able to help each other out, asked Blume to

come to his hotel room on two occasions, threatened to pull his employment players card if

she declined and laughed while exposing Blume to internet pornography.   Accordingly,

Blume has presented a jury question with respect to her outrage claim.

**E.    Intentional Interference With Contractual or Business Relations:**

Blume next brings a claim for intentional interference with contractual or business relations.  In support of her claim, she testified that she contacted VIP, the employment agency that had placed her with Shelby Concrete, and requested alternative employment. Although Blume had obtained several placements from VIP in the past, a VIP representative purportedly informed Blume that a female from Shelby Concrete had called VIP and said Blume was having an affair with Knox.  While the VIP representative did not explicitly state that VIP was not going to place Blume, she got the impression that no placement would occur because of the telephone call from Shelby Concrete.  (Blume Dep. 472-73, 492-94.)  Given this information, Blume attempts to hold Shelby Concrete liable for intentional interference with contractual relations.

The Court finds that Shelby Concrete is entitled to summary judgment on this claim.  The record contains no evidence that the alleged telephone call from Shelby Concrete was the reason that VIP failed to offer Blume additional placements.  More importantly, there is no evidence that the caller had the authority to act on behalf of Shelby Concrete.

An employer can be held liable for acts of its employees where the acts were done in the line and scope of employment, the acts were done in furtherance of the employer's interest, or if the employer participated in, authorized, or ratified the wrongful acts." *Potts*

*v. BE & K*, 604 So. 2d 398, 400 (Ala.1992).  In order to show that the Shelby Concrete ratified the challenged conduct, Blume must show that: (1) Shelby Concrete had actual knowledge of the tortious conduct; (2) based on this knowledge, Shelby Concrete knew the conduct constituted a tort; and (3) Shelby Concrete failed to take adequate steps to remedy the situation.  *See Ex parte Atmore Community Hosp.*, 719 So. 2d 1190, 1194 (Ala. 1998) (citation omitted).  Blume meets none of these requirements.  Accordingly, she cannot go forward with her intentional interference with contractual relations claim.

**F.     Negligent Supervision, Training and Retention Claim:**

Shelby Concrete contends that Blume's Alabama state law claim for negligent supervision, training and retention claim is not actionable because Alabama does not recognize a cause of action for sexual harassment.  Rather, any negligence claim associated with alleged sexual harassment can only be pursued if Blume has a viable state law claim, which Shelby Concrete argues she does not.

Inasmuch as the Court has determined that Blume has viable state law claims, her negligence claim may also go forward.

**CONCLUSION**

For the reasons set forth above, the Court finds that Blume has established a genuine issue of material fact with respect to her sexual harassment claim, retaliation

claim**,** invasion of privacy claim, outrage claim and negligent supervision, training and retention claim.  However, Shelby Concrete is entitled to summary judgment on Blume's intentional interference with contractual relations claim.

Done this 12th day of June, 2007.

_____
U.W. Clemon
United States District Judge